**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

UNITED STATES OF AMERICA

v.

JOHNNY LEE WESLEY,

Defendant.

Case No. 1:97-cr-382-2

**OPINION & ORDER**

Defendant Johnny Lee Wesley has served nearly 28 years in prison after his conviction for the murder of Raymond Mills and related drug crimes in 1998. At the time he sentenced the defendant, the Honorable Henry Coke Morgan, Jr. was required to impose a life sentence—but that would no longer be the case today.

Last year, this Court reduced the life sentence of one of Defendant Wesley's co-defendants, Terrence Renard Russell. That reduction, made pursuant to the First Step Act of 2018, created an additional disparity—between Defendant Wesley's sentence and the sentences of the individuals most directly comparable to him.

Though it is just that the defendant should serve the longest sentence of those responsible for Mills's murder, the difference is much too great—especially in light of Defendant Wesley's youth at the time of his offenses. Finding extraordinary and compelling reasons justifying a reduction in his sentence, and concluding that the statutory sentencing factors favor that outcome, the Court will grant the defendant's motions for compassionate release.

## I. BACKGROUND

The defendant was first taken into federal custody on November 6, 1997. ECF No. 3. On January 27, 1998, a jury convicted him on three counts:

- Count I: Conspiracy to distribute 50 grams or more of marijuana, cocaine, and cocaine base (21 U.S.C. § 846);
- Count II: Murder in furtherance of a drug trafficking offense (21 U.S.C. § 848(e)(1)(A)); and
- Count III: Interstate transportation in aid of racketeering (18 U.S.C. § 1952).

ECF No. 38. On May 8, 1998, Judge Morgan sentenced the defendant to imprisonment for life on all three counts, to be served concurrently. ECF No. 43. The United States Court of Appeals for the Fourth Circuit affirmed the defendant's conviction. ECF No. 57; *United States v. Wesley*, 187 F.3d 633 (4th Cir. 1999) (unpublished table opinion).

On May 12, 2020, the defendant filed an emergency motion for compassionate release citing circumstances arising from the COVID-19 pandemic. ECF No. 244.[1] After the parties briefed that motion, the defendant filed another motion for compassionate release on January 17, 2024, providing additional reasoning to support his request for a sentence reduction. ECF No. 339.

[1] This case was reassigned to this Court on March 17, 2023.

## II. LEGAL STANDARD

### A. Exhaustion

Before a court may consider a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must exhaust their administrative rights to appeal failure of the Federal Bureau of Prisons to bring a motion on the defendant's behalf. 18 U.S.C. § 3582(c)(1)(A). Alternatively, once 30 days have passed after the defendant requested relief from the warden of their facility, the defendant may file a motion with the court as though they had exhausted their administrative remedies. *Id.*; *see United States v. Muhammad*, 16 F.4th 126, 131 (4th Cir. 2021) (clarifying that defendants may satisfy the exhaustion requirement by waiting 30 days from the date of their initial request to file a motion in the district court, even if the warden has already responded to their request). The exhaustion requirement "is a non-jurisdictional claim-processing rule" and therefore "may be waived or forfeited." *Muhammad*, 16 F.4th. at 130.

### B. Merits

A court may modify a term of imprisonment under 18 U.S.C. § 3582(c)(1)(A)(i) if, after considering the sentencing factors in 18 U.S.C. § 3553(a), it finds that "extraordinary and compelling reasons warrant such a reduction." *United States v. Hargrove*, 30 F.4th 189, 197–8 (4th Cir. 2022). The overarching purpose of the compassionate release mechanism guides district courts' consideration:

> When Congress authorized district courts, as a matter of discretion, to release an inmate from prison based on extraordinary and compelling reasons, it did so to introduce compassion as a factor in assessing ongoing

> terms of imprisonment, authorizing a district court to give greater weight to an inmate's personal circumstances — when sufficiently extraordinary and compelling — than to society's interests in the defendant's continued incarceration and the finality of judgments. Thus, motions for relief under § 3582(c)(1)(A)(i) ask courts to balance the severity of the inmate's personal circumstances, on the one hand, against the needs for incarceration, on the other.

*Id.* at 197. Courts in this district have generally considered the defendant's arguments regarding extraordinary and compelling reasons for sentence reduction first, then balanced the outcome of that analysis against the sentencing factors in section 3553(a). *E.g.*, *United States v. Ogun*, 657 F. Supp. 3d 798, 806–11 (E.D. Va. Feb. 24, 2023); *United States v. Nurani*, No. 2:11-cr-34-3, 2023 WL 2058649, at *3 (E.D. Va. Feb. 16, 2023).

***i. Extraordinary and Compelling Reasons***

A court may reduce a prisoner's sentence under § 3582(c)(1)(A)(i) if it finds "extraordinary and compelling reasons" to do so. The defendant bears the burden of demonstrating such reasons. *See Hargrove*, 30 F.4th at 195.

The United States Sentencing Commission has promulgated a policy statement, U.S.S.G. § 1B1.13, which attempts to define what may constitute extraordinary and compelling reasons. *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). The policy statement provides a non-exhaustive list of extraordinary and compelling reasons for reducing a sentence:

> (1) the defendant's medical circumstances, U.S.S.G. § 1B1.13(b)(1);
>
> (2) the defendant's age, U.S.S.G. § 1B1.13(b)(2);

(3) the defendant's family circumstances, U.S.S.G. § 1B1.13(b)(3);

(4) whether the defendant was a victim of abuse while incarcerated, U.S.S.G. § 1B1.13(b)(4);

(5) "other reasons," U.S.S.G. § 1B1.13(b)(5); or

(6) an unusually long sentence, if the defendant meets certain conditions, U.S.S.G. § 1B1.13(b)(6).

The Sentencing Commission's policy statement provides that extraordinary and compelling reasons exist in several circumstances related to the defendant's physical health. First, where:

> The defendant is suffering from a terminal illness . . . serious physical or medical condition . . . serious functional or cognitive impairment . . . [or] deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(A–B). Second, where:

> The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

U.S.S.G. § 1B1.13(b)(1)(C). And lastly, where:

> . . . (i) The defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>
> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

> (iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G § 1B1.13(b)(1)(D)(i–iii).

The Fourth Circuit has clearly concluded that the policy statement "does not constrain the discretion of district courts" when it comes to the extraordinary and compelling reasons analysis. *McCoy*, 981 F.3d at 281. The "other reasons" provision ensures that courts are "empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise." *Id.* at 284 (citation omitted, emphasis in original).

***ii. 18 U.S.C. § 3553(a) Factors***

After completing the extraordinary and compelling reasons analysis, a court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Mumford*, 544 F. Supp. 3d 615, 617–20 (E.D. Va. June 21, 2021). Even if the court finds extraordinary and compelling reasons to reduce a petitioner's sentence, it may ultimately deny a motion for compassionate release if its analysis of the § 3553(a) factors counsels against release. *Id.* Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the Sentencing Commission];

(5) any pertinent policy statement [issued by the Sentencing Commission] [that is in effect on the date the defendant is sentenced except as provided in section 3742(g)];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## III. ANALYSIS

### A. Exhaustion

The Court finds that the defendant has satisfied the exhaustion requirement. The defendant submitted a request for compassionate release on April 6, 2020. ECF No. 244 at 2.[2] The warden denied his request that same day. *Id.* The defendant's first

[2] The defendant originally contacted his case management coordinator on April 6, 2020, but was told to contact the warden of his facility. ECF No. 244 at 2. Although that contact did not happen until April 16, 2020, both parties still agree the initial contact on April 6 meets the exhaustion requirement. *See* ECF No. 260 at 20.

motion came more than 30 days after that initial request, so he satisfied the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A).

**B. Merits**

The defendant argues, first, that his medical conditions are extraordinary and compelling reasons that warrant a reduction in his sentence; and second, that a variety of other factors in his case constitute "other reasons" for relief, including his (1) unusually long sentence (given current Sentencing Guidelines and his age at the time of the offenses) and (2) significant rehabilitation efforts. *See* ECF No. 244 at 6, ECF No. 339. While the Court is not persuaded that the defendant's medical conditions are sufficient grounds to grant the defendant's request, there are extraordinary and compelling "other reasons"—flowing from two forms of sentencing disparities—that justify a reduction in his sentence. U.S.S.G. § 1B1.13(b)(5)

***i. Extraordinary and Compelling Reasons***

*a. Medical Circumstances*

First, the defendant argues that serious medical conditions leave him unable to care for himself while he is incarcerated. *See* ECF No. 261 at 3. The Court acknowledges that the defendant has serious health conditions: morbid obesity, hypertension, atrial fibrillation, deep vein thrombosis, hyperlipidemia, pulmonary embolus, stage three chronic kidney disease, sleep apnea, pressure ulcers, gout, anemia, and gastrointestinal reflux disease. *See* ECF No. 244 at 7.

However, the defendant has not shown that his medical conditions cannot be treated within his BOP facility. In fact, the defendant submitted numerous medical

reports that make it clear his condition is being regularly assessed and treated by competent medical professionals. *See* ECF Nos. 244-6, 253-4; ECF No. 348-1 at 15. The defendant's conditions are not "terminal" or severe to such a degree that would create an extraordinary or compelling reason for release on their own. U.S.S.G. § 1B1.13(b)(1)(A).

Second, the defendant argues that he suffers from medical conditions that require long-term care that he is unable to obtain while incarcerated. *See* ECF No. 340 at 4–5 ("I can get much better healthcare, much better food, more fresh air, more quality exercise and be able to get procedures[.]"). But there is no evidence in the record that the specific treatments the defendant mentions are necessary to prevent "serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C).

Inadequate medical care may be a relevant factor in finding extraordinary and compelling reasons. *See United States v. Beck*, 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019). However, "[c]ourts have generally been hesitant to second-guess BOP's medical care absent a strong showing that the care is inadequate." *United States v. Burr*, No. 1:15-cr-362, 2022 WL 17357233, at *6 (M.D.N.C. Dec. 1, 2022) (collecting cases). The defendant does not make such a showing here.

Finally, the defendant argues that his medical conditions prohibit him from safely obtaining the COVID-19 vaccine and, as a result, he is at increased risk of suffering severe medical complications or death from exposure to the disease. *See* ECF No. 308 at 3. However, the latest data available show only one open COVID

case at the defendant's BOP facility,[3] and the federal public health emergency concerning COVID-19 has ended.[4] So, because the defendant's BOP facility is not *currently* "at imminent risk of being affected by [] an ongoing outbreak," the defendant has not met his burden here either. U.S.S.G. § 1B1.13(b)(1)(D)(i).

*b. Other Reasons*

The disparity between the defendant's sentence and the sentences his co-defendants served, coupled with a broad trend toward lower sentences for individuals convicted of murder, constitute extraordinary and compelling reasons to reduce the defendant's sentence from a term of life. This conclusion is bolstered by the defendant's youth at the time of his offenses and the rehabilitation he has achieved during the nearly three decades he has spent in prison.

1. Sentence Disparity: 1998 to 2025

In 1998, when he sentenced the defendant, Judge Morgan had no choice but to impose a life sentence. *See* ECF No. 47, *United States v. Booker*, 543 U.S. 220, 245 (2005) (holding, seven years after the defendant was sentenced, that sentencing

[3] The defendant is currently housed at FCI Allenwood. Federal Bureau of Prisons, *Find An Inmate*, https://www.bop/gov/inmateloc/ (last visited Sept. 9, 2025). Although the COVID-19 data available for FCI Allenwood is from January 2025, those data show a similarly small number of open COVID cases across the nation. *See* Federal Bureau of Prisons, *Inmate COVID-19 Data*, https://perma.cc/VL7B-X68M (last visited Sept. 9, 2025).

[4] Ctrs. for Disease Control and Prevention, *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, https://perma.cc/9438-CS4T (last visited Sept. 9, 2025) ("May 11, 2023, marks the end of the federal COVID-19 PHE declaration.").

guidelines ranges are not binding).[5] But in the post-*Booker* world, defendants may present arguments in favor of a more lenient sentence than the guidelines suggest. If that had been the state of the law when the defendant was sentenced, it would have been up to Judge Morgan to consider such arguments and to fashion a sentence that was "sufficient[] but not greater than necessary." 18 U.S.C. § 3553(a). Having reviewed the relevant empirical data and the record in this case, it is evident to this Court that were the defendant sentenced today, he would receive a shorter sentence than he did nearly 30 years ago.

During Fiscal Year 2024 (the most recent data available), federal sentences for murder averaged 274 months nationwide and 273 months in the Fourth Circuit.[6] Sentences for drug trafficking averaged 82 months nationwide and 89 months in the Fourth Circuit.[7] As of the date of this Opinion and Order, the defendant is 48 years old. *See* ECF No. 251 at 2. He has spent about 334 months (27 years 10 months)—over half his life—in prison. In less than three years, the defendant will have been incarcerated for an amount of time equal to consecutive terms comprised of the

---

[5] If the defendant was sentenced today, his conspiracy conviction under 21 U.S.C. § 846 would normally result in a different sentencing guidelines range due to the First Step Act of 2018. *See* U.S.S.G. § 2D1.1(c); First Step Act of 2018, Pub. L. 115–391, § 404(b), 132 Stat. 5194, 5222 (2018). However, since the defendant was convicted of murder under 21 U.S.C. § 848(e)(1)(A), the cross-reference in U.S.S.G. § 2D1.1(d)(1) would still provide a sentencing guidelines range of up to life imprisonment for both crimes.

[6] *Sentence Length by Type of Crime*, U.S. SENT'G COMM'N, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/4c24.pdf (last visited Sept. 9, 2025).

[7] *Id.*

Fourth Circuit averages for each category of offense he committed.[8] And without intervention, the defendant will continue to sit in prison far beyond the average modern sentences for any of his crimes. The defendant should not have to die in prison merely because he was sentenced in 1998 rather than 2025. *See United States v. Johnson*, 143 F.4th 212, 216 (4th Cir. 2025) ("[I]t was well within the district court's discretion to find 'other reasons,' such as [the defendant's] sentencing disparity, constituted an extraordinary and compelling factor that weighed in favor of granting relief.").

The government argues that average sentence data are "meaningless" because the data are not broken down far enough, to reflect sentences for different types of killings. ECF No. 373 at 14. The Court agrees that more detailed data would be helpful, but the government is wrong to say the data that are available have no meaning at all. Here, the Court has used data about murder sentences—despite the limitations—to capture a truth it has observed empirically: Modern sentences are generally shorter than sentences issued decades ago. The Court does not need perfect statistics or even a comprehensive explanation of *why* judges' decisions have trended this way over time in order to determine with confidence that the defendant's life sentence is significantly longer than the sentences others are serving for similar crimes.

---

[8] The Sentencing Commission's data group life sentences with terms of years over 470 months (often considered *de facto* life sentences), so this Court cannot determine how many individuals convicted of murder were sentenced to life.

The government also asserts that it is "problematic" to compare the defendant's sentence to modern averages "without more information regarding the nature and circumstances of the offenses involved, the strength of the government's evidence, and whether the defendants pleaded guilty, provided assistance to the government, or put the government to its burden of proof at trial." ECF No. 373 at 14. Again, the kinds of information the government cites would surely be useful. But it is incorrect to suggest that this Court should not consider what it *does* know about sentence disparities merely because it could, with additional data, know more.

The government's reasoning is at odds with the law in the Fourth Circuit, which explicitly recognizes district courts' authority to modify sentences based upon disparities even though perfect data have never been available. *See Johnson*, 143 F.4th at 216. The government's concerns about ensuring the defendant's sentence reflects the nature and circumstances of his offenses are appropriately factored in at the second stage of the sentence reduction inquiry. *See* 18 U.S.C. § 3553(a). Such considerations are not a bar to finding that a statistical sentencing disparity contributes to extraordinary and compelling reasons justifying relief.

This case presents the question of whether a life sentence issued nearly 30 years ago is still justified, given the reality that such a sentence would likely not be issued today in otherwise similar circumstances. The Court will not shrink from answering that question merely because it possesses less than ideal data about the disparity it knows exists. The defendant has demonstrated that the disparity that

has developed over time among sentences for murder contributes to an extraordinary and compelling reason to reduce his sentence.

2. Sentence Disparity Among Co-Defendants

Among the reasons courts have trended toward issuing lesser sentences over recent history may be a growing understanding of systemic injustice and increased recognition of the ways in which the criminal legal system impacts marginalized people. The First Step Act of 2018 sought to "ensure greater justice for those subject to a racially disparate sentencing scheme." *United States v. Swain*, 49 F.4th 398, 401 (4th Cir. 2022). Last year this Court, applying the First Step Act, reduced the sentence of Defendant Russell, who was originally given a life sentence identical to Defendant Wesley's. *United States v. Russell*, 729 F. Supp. 3d 584 (E.D. Va. 2024). Defendant Russell was released from prison on April 15, 2024.[9] The Court is compelled to consider whether that change created a sentence disparity internal to this case that constitutes an extraordinary and compelling reason to reduce Defendant Wesley's sentence as well.

It is undisputable that Defendant Wesley was the most culpable actor here. And it is now inevitable that Defendant Wesley's sentence will be the longest of the three defendants charged in relation to Mills's murder.[10] The question is *how much*

[9] *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Sept. 10, 2025).

[10] The third individual charged in relation to Mills's murder received a lesser sentence due to his acceptance of responsibility and cooperation with the government: Defendant Colin Rose was released on July 2, 2014. *Id.*

longer Defendant Wesley's sentence should be than the other defendants'—and whether life is appropriate.

Here, the reasons for finding Defendant Wesley's circumstances extraordinary and compelling start to run together. He is surely more culpable than the other defendants by virtue of the relative severity of their *conduct* and the relative harm they directly caused. But when the Court considers other factors—Defendant Wesley's likely susceptibility to influence from the older defendants and the fact that he was likely more impulsive than the others by virtue of his brain's stage of development at age 21—the gap between Defendant Wesley and Defendant Russell starts to narrow. And the policy considerations that underpinned this Court's application of the First Step Act in Defendant Russell's case apply here equally. Taken together, all these things persuade the Court that while Defendant Wesley must serve a sentence longer than Defendants Russell and Rose, it would be unjust for Defendant Wesley to serve another 20, 30, or 40 years after both the other defendants' sentences are over.

The government contends that the fact Defendant Wesley is the most culpable of the individuals convicted defeats the conclusion that a sentence disparity internal to the case is an extraordinary and compelling reason to reduce Defendant Wesley's sentence. *See* ECF No. 373. But since Defendant Wesley will necessarily serve a longer sentence than either of the other defendants regardless of what the Court does here, the government's position is not that the Court should avoid finding extraordinary and compelling reasons to reduce the sentence of a more culpable

defendant when doing so would make their sentence equal to the sentence of a less culpable defendant. And, strangely, the government does not argue that while a sentence disparity among co-defendants can generally be an extraordinary and compelling reason for a reduction, the factors at play *here* do not justify a reduction. Instead, the government's position appears to be that, as a matter of law, there is no extraordinary and compelling reason for a sentence reduction based on a sentencing disparity between co-defendants, for the most culpable actor. The Court disagrees.

It is true that in the case where the Fourth Circuit recognized a district court's authority to recognize a disparity between co-defendants' sentences as an extraordinary and compelling "other reason" for compassionate release under U.S.S.G. § 1B1.13(b)(5), the defendant who received a reduction was less culpable than his co-defendants. But the Fourth Circuit did not say that U.S.S.G. § 1B1.13(b)(5) can be applied to adjust disparate sentences only for less culpable defendants. *See Johnson*, 143 F.4th at 216 (noting that the Fourth Circuit has never held that "a sentencing disparity alone is not enough to constitute an extraordinary and compelling reason to grant compassionate release").[11] Indeed, an individual who ought to serve a longer sentence than their co-defendants can still face a sentence

[11] The government asserts that the *Johnson* decision "created a circuit split by holding that the fact that a co-conspirator received a shorter sentence after pleading guilty and cooperating is an extraordinary and compelling reason to reduce the sentence of a defendant who put the government to its burden of proof at trial." ECF No. 373 at 12 n.4 (quotation marks omitted). That is a misunderstanding of the Fourth Circuit's holding, and it does not represent a circuit split.

that is unfairly long. And that disparity can be worsened if the Court adjusts one defendant's sentence without attending to another's.

If the Court had reduced defendant Russell's sentence based purely on something Defendant Russell had done—like pleading guilty or assisting the government—that reduction would not necessarily have created an unjust disparity between the sentences Defendants Russell and Wesley served. But that is not what happened. The centerpiece of the Court's reasoning in Defendant Russell's case dealt with the effect of the First Step Act and the Fourth Circuit's embrace of the Sentence Package Doctrine, which together enabled this Court to consider whether reducing Defendant Russell's sentence would help to "ensure greater justice for those subject to racially disparate sentencing schemes." *Russell*, 729 F. Supp. 3d at 593 (quoting *Swain*, 49 F.4th at 401) (emphasis and quotation marks removed). Because the First Step Act provided the vehicle for the sentence reduction in *Russell*, it is only just for the Court to consider whether Defendant Wesley's sentence should also be reduced, to avoid a disparate outcome. A reduced sentence for Defendant Wesley could still—and here, mathematically must—be longer than the sentences served by the less culpable individuals charged in connection with Mills's death.

2. Youth at the Time of the Offenses

The defendant was 20 years old at the time he committed his offenses and 21 at the time of sentencing. *See* ECF No. 251 at 2. The Fourth Circuit has not said whether a defendant's youth *on its own* can constitute an extraordinary and

compelling reason for a sentence reduction,[12] but this Court need not answer that question here. As the Court began discussing above, the defendant's age is an important factor in understanding the nature of the sentencing disparities presented in this case, which are independently extraordinary and compelling reasons for compassionate release.[13]

The Supreme Court has repeatedly acknowledged the scientific fact that young people "are constitutionally different from adults for purposes of sentencing." *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"). Although the defendant was 20 years old at the time he committed these crimes, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper v. Simmons*, 543 U.S. 551, 574 (2005).

[12] At least one federal court of appeals has concluded it cannot be. *United States v. Bryant*, 144 F.4th 1119, 1128 (9th Cir. 2025).

[13] Some courts considering motions for sentence reduction have found it inappropriate to factor in a defendant's youth at the time of the offense, because the statutory sentencing factors already enable judges to account for youth in rendering the original sentence. *E.g.*, *United States v. Augustin*, No. 20-3609, 2021 WL 6059564, at *1 (3d Cir. Dec. 20, 2021) (affirming a district court's decision that a defendant's youth was not an extraordinary and compelling reason for reduction where the factor was already considered at the original sentencing). But here, Judge Morgan had no opportunity to adjust the defendant's sentence based on the sentencing factors—indeed, he imposed the sentence without any explanation or comment whatsoever. *See* ECF No. 56 at 27. Now that it is permitted to do so, this Court believes it is critical to consider the role the defendant's age might have played in a sentence tailored to his particular circumstances and to fashion a new sentence that takes into account what we now know about the role of brain development in criminal conduct.

In the past year, the Sentencing Commission adopted a policy statement that reflects the relevance of age at sentencing. Amendment 829 to the Sentencing Guidelines, which took effect November 1, 2024, added language to U.S.S.G. § 5H1.1 specifically providing that a downward departure may be warranted in cases where the defendant was young at the time of the offense. The policy statement concludes:

> Certain risk factors may affect a youthful individual's development into the mid-20[]s and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S.S.G. § 5H1.1; *see also Amendment to the Sentencing Guidelines*, United States Sentencing Commission, at 25 (Apr. 30, 2024) (explaining that Amendment 829 was promulgated pursuant to the Commission's "duty to establish sentencing policies that reflect 'advancement in knowledge of human behavior as it relates to the criminal justice process'") (quoting 28 U.S.C. § 991(b)(1)(C)). Even if Judge Morgan had been permitted to order a term of years instead of the advisory life sentence, he would not have had the guidance provided in this policy statement.

It is therefore appropriate for this Court to consider this scientific truth which, though not fully understood at the time, may have played a role in the defendant's conduct. The principle recognized in U.S.S.G. § 5H1.1 and the Supreme Court's jurisprudence around youth neither excuse nor justify the defendant's behavior in 1997, but those factors do help explain why—now that the Sentencing Guidelines are

no longer binding—this Court ought to consider whether a life sentence for someone so young may be "greater than necessary." 18 U.S.C. § 3553(a).

The government avers that these factors are inapplicable to the defendant because his conduct in this case "was not an impulsive act[;] [i]t was carefully planned." ECF No. 373 at 16. While it is certainly true that Defendant Wesley—along with Defendants Rose and Russell—planned to *assault and rob* Mills, the Court cannot infer from there that Defendant Wesley planned to kill Mills all along. On the evidence before the Court, it is at least as likely that the defendant only ever intended to follow the instructions he was given and that when things went south, he reacted rashly—like a 20-year-old is prone to do. That is not to minimize the severity of the defendant's conduct or the significant harm he caused in any way. But the government overplays its hand by suggesting the Court can eliminate youth as a factor in this case merely because the defendant contemplated *some* of his actions in advance.

Even if impulse played no role in the defendant's crimes, it is still true that young people "are more capable of change than are adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults." *Graham*, 560 U.S. at 68 (quotation marks and citation omitted). Given that the Court must still consider the § 3553(a) sentencing factors before reducing the defendant's sentence, it finds that the defendant's relative youth at the time he committed these crimes supports an overall finding of extraordinary and compelling reasons to move to that step of the analysis.

3. Rehabilitation

"[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for the purposes of this policy statement;" however, rehabilitation "may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d). Because the defendant's rehabilitation has been exemplary, the Court considers it alongside the other reasons it has already found extraordinary and compelling.

Those who know the defendant describe him as a "tremendously . . . respectable and moral man" who is a "mentor to many of the younger inmates." ECF No. 352 at 1. It is clear to the Court that the defendant has become a leader to his peers by treating everyone he encounters with equal respect. For example, the defendant advocated for a fellow prisoner who faced social pressure when he expressed curiosity toward learning about religions other than his own. ECF No. 351 at 1. And a former police officer who was incarcerated with the defendant and faced mistreatment from other prisoners told the Court that because the defendant accepted him, others came to "view [him] as a person." ECF No. 355 at 1.

The defendant is a spiritual leader at his facility, and nearly every letter the Court received discussed the impact the defendant's faith has had on those around him. Many of those incarcerated with him describe being "immediately affected" by defendant's kindness and respect toward others and the positivity he showed despite his life sentence. ECF No. 356 at 1; *see, e.g.*, ECF No. 355 at 1 (one inmate recounting

how his life was changed when he walked by the prison chapel to hear the defendant "preaching and teaching").

The defendant's influence extends beyond the walls of the facilities where he has been incarcerated. The defendant teaches GED courses to his fellow inmates, and because so many of his students have successfully obtained GEDs, "several prisoners would only want to attend his classes[,] because they believed the way [the defendant] taught allowed them to learn the material more effectively." ECF no. 351 at 1. One individual who met the defendant in prison attests that the defendant's "transformation" taught him that "change is possible for anyone." ECF No. 350 at 1. The defendant has continued to mentor this person even after he left prison, connecting him with the defendant's own family and supporting him in starting two businesses. *Id.*

For someone who could have given up after receiving a life sentence, the defendant's commitment to self-improvement has been remarkable. He has completed 370 hours of training in electrical work. *See* ECF No. 293-2 at 2. He studied for 915 hours to earn a legal assistant certificate. *Id.*; *see* ECF No. 293-3 at 21. In addition to the many other educational courses he has taken, the defendant currently serves as a unit orderly. *See* ECF No. 244-11 at 5. Once he returns home, the defendant plans to "spearhead [a] non-profit [that] will provide employment to formerly incarcerated individuals" and to "work with underserved and at-risk youth to steer them in the right direction." ECF No. 357 at 1; *see generally* ECF No. 358 (letter from a representative of the program the defendant intends to work with).

The defendant's achievements while in prison and—even more—the testimony of those whose lives he has changed for the better reinforce the Court's conviction that when he was sentenced to life at age 20, the defendant was not yet the man he was meant to be. The Court finds that the defendant's rehabilitation supports a finding of extraordinary and compelling other reasons to reduce his sentence to a term of years.

* * *

The Court finds that the defendant has met his burden to show extraordinary and compelling reasons that warrant a reduction in his sentence. To be clear, the analysis here should not be understood to suggest that *all* sentences beyond the average federal sentence length constitute grounds for compassionate release or that there are no circumstances in which a younger defendant should be sentenced to life in prison. The finding in this case is specific to this defendant's showing of extraordinary and compelling reasons that justify relief. Because the Court finds that the defendant is serving a sentence "dramatically longer than necessary or fair" given his individual circumstances taken as a whole, the Court exercises its authority to revisit the defendant's sentence. *McCoy*, 981 F.3d at 286.

***ii. 18 U.S.C. § 3553(a) Factors***

In fashioning a new sentence, the Court looks to the factors outlined in 18 U.S.C. § 3553(a) to determine what sentence is "sufficient[] but not greater than necessary," to the extent the factors are applicable to the defendant's case. 18 U.S.C.

§ 3553(a). The Court has—as it must—considered all the factors, but those discussed below stand out as especially informative here.

The nature and circumstances of this offense are undoubtedly severe. The defendant was a friend and customer Defendant Russell, who dealt drugs in Prince George's County, Maryland with another local dealer, Defendant Rose. ECF No. 251 ¶¶ 10, 14. When Defendant Rose learned that a third dealer, Mills, allegedly spread rumors that Defendant Rose was a snitch, Defendants Rose and Russell asked Defendant Wesley to beat up and rob Mills in exchange for money, jewelry, guns, and cocaine. *Id.* at ¶ 15. Two days later, Defendant Wesley (and his cousin) robbed Mills and tied him up. *Id.* at ¶ 16. When police got to the scene, they saw that Mills's head, face, hands, and feet were tightly bound with gray duct tape. *Id.* at ¶ 20. Mills's autopsy concluded that he died of ligature strangulation from the duct tape. *Id.*

There is no doubt that the defendant's actions were grave and serious. *See* 18 U.S.C. § 3553(a)(2)(A). And the government correctly notes that after Mills's death, the defendant engaged in further troubling behavior (ransacking Mills's apartment, selling large quantities of cocaine stolen from Mills, stealing from a convenience store, etc.). *See* ECF No. 260 at 8–9. The Court's conclusion that the § 3553(a) factors counsel in favor of a lesser sentence should not be taken to suggest that this factor has shifted. It has not.

Ultimately, though, the nature and circumstances of the offense are but one factor for the Court's consideration. And when the Court looks at other sentencing factors, such as the need to protect the public from further crimes of this defendant,

18 U.S.C. § 3553(a)(2)(C), the balance there has shifted over time. *Cf. United States v. Malone*, 57 F.4th 167, 176 (4th Cir. 2023) (reversing district court's denial of a sentence reduction where, "since [sentencing], the balance of [the] relevant § 3553(a) factors ha[d] shifted," such that the defendant's "sentence [was] no longer just"). None of the defendant's prior convictions (most of which were juvenile adjudications at ages 16 and 17 that occurred in Maryland) were crimes of violence under state law.[14] *See* ECF No. 251 ¶¶ 26–36. The only reference to violent behavior in the defendant's criminal history is a battery *charge* that was placed on the "stet docket"—an administrative device typically used in Maryland state courts to enable defendants to complete a diversion program or demonstrate good behavior for a period of time before their case is dismissed. *Id.* at ¶ 26.[15]

The defendant's revised sentence will still serve the purposes of specific and general deterrence. The defendant is not the same person now, at age 48, as he was when he entered prison. The Court is convinced that, as a result of his incarceration, the defendant is extremely unlikely to commit another serious crime. While incarcerated, the defendant has been charged with an institutional offense only four times in three decades, and none of the infractions were for violent conduct. The defendant's most recent violation—relating to possession of pornographic material—

[14] *See* ECF No. 251 ¶¶ 26–36; *Crimes of Violence and Violent Crimes*, MD. STATE COMM'N ON CRIM. SENT'G POL'Y, https://perma.cc/4ZXY-W9UAF (last visited Sept. 10, 2025).

[15] *See Stet in a Maryland Criminal Case: What You Need to Know,* JEREMY WIDDER LAW, https://perma.cc/F83C-LL3W (last visited Sept. 8, 2025).

was punished severely, and that violation occurred almost five years ago. ECF No. 348-1 at 10. The other three violations occurred more than 15 years ago. *Id.* And in 2022, the BOP found the defendant had a "low risk recidivism level." *Id.* at 16. The Court's review supports that conclusion. *See, e.g.*, ECF No. 352 (describing the "stable and strong support system" the defendant has outside of prison and expressing that he has the "tools necessary for a smooth and successful transition into society").

Additionally, the letters written in support of the defendant, and his efforts at rehabilitation, suggest that the defendant's experience has served as a guide to others. *See, e.g.*, ECF No. 350 at 1 (describing the "humility and courage [the defendant] displayed in changing his life while facing the possibility of [lifetime] incarceration"); ECF No. 351 at 2 (former prisoner describing how the defendant's mentorship helped him "abstain[] from reoffending" for more than 20 years after his own release).

As part of his sentence, Judge Morgan ordered the defendant to pay $100,000 in restitution to Mills's children. ECF Nos. 43, 348-2. The defendant has paid the entire amount, using money his mother left him when she died in 2021. ECF No. 313 at 1. That speaks volumes about the defendant's character. That he would choose to spend this money to help make amends to Mills's family—even though the defendant must have known that release from prison would be a long-shot—tells the Court that the defendant's acceptance of responsibility is not mere lip service. It has permeated his life and will continue to affect his relationships in society once he is released.

While money can never make Mills's family whole, the Court takes seriously the fact that the defendant has completed this step in atoning for his crimes.

At the time of his sentencing, the defendant maintained he was innocent. *See* ECF No. 340 at 6. But now the defendant acknowledges that he "should have accepted the consequences for [his] wrong" and is "sorry for what [he] did wrong in life and in taking Raymond Mills['s] life." *Id.* Genuine acknowledgement of the harm he caused and admission of wrongdoing are significant when the Court compares the person the defendant was in 1998 to the person he appears to be today. Simply put, the defendant appears to be an example of the carceral system providing an opportunity for an individual to reenter society better than they left it.

Finally, as explained in Part III.B.i.b above, the Court has carefully considered the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Here, the defendant is more culpable than Defendant Russell, whom the Court resentenced last year. Defendant Russell's sentence is the single best comparator for determining whether Defendant Wesley's sentence is appropriate. The Court concludes that Defendant Wesley must serve a longer sentence than his co-defendant, because Defendant Wesley is the one who turned a planned assault and robbery into a murder.

Just as the defendant's age at the time of the offenses contributes to the Court's finding of extraordinary and compelling "other reasons" that allow it to modify the defendant's sentence, so too is it an important factor in how the defendant's sentence

should be reduced. *See McCoy*, 981 F.3d at 286. The defendant has written extensively about the negative influences that led him to choose as a child to become involved with drugs and criminal activity. *See* ECF 293-1 at 1. It is unfortunate that the defendant could not follow the example provided by his mother and stay away from those negative influences. *Id.* But while this Court does not think the defendant's youth *excuses* his crimes, the defendant's age at the time of these offenses weighs against the conclusion that a life sentence is appropriate. Thus, the defendant's "history and characteristics" favor a long sentence but not a life term. 18 U.S.C. § 3553(a)(1).

* * *

The government has made concerted efforts to attempt to contact Mills's family but has been unsuccessful. Mills's mother initially opposed Defendant Russell's request for a sentence reduction but later changed her mind, after learning that Defendant Russell had shown remorse for his crimes and after reading the letters in support of his petition. *United States v. Russell*, 1:97-cr-382-1, ECF No. 332 at 7. During those conversations, the victim's mother "indicated to counsel that she would oppose any relief for [Defendant] Wesley, given his greater role in the killing of her son." ECF No. 373 at 18 (emphasis removed). Because the government has been unable to reach them, the Court cannot know whether Mills's family would support its decision in Defendant Wesley's case now, given the reasoning provided here. It is the Court's sincere hope that they would.

* * *

The defendant's advisory sentencing guidelines range is still life. *See supra* n.5. However, this Court is no longer bound to follow that recommendation. *See Booker*, 543 U.S. at 245. The Court finds that the balance of the factors outlined in 18 U.S.C. § 3553 favors reducing the defendant's sentence to a term of 480 months. This new sentence is "sufficient" to satisfy the goals of punishment but not "greater than necessary." 18 U.S.C. § 3553(a).

## IV. CONCLUSION

The Court does not make this decision lightly. Raymond Mills did not deserve to die, and it is right that Defendant Wesley be punished for his role in Mills's death. But, given the representations from the defendant, his counsel, and the friends and family who wrote in support of the defendant's motions, the Court finds that a life sentence is no longer appropriate in this case.

The Court appreciates that the defendant has thought about how he can help young people by telling his story. *See* ECF No. 293-1 at 2. Now is the time for the defendant to follow his mother's hopes for him and make her proud by putting those thoughts into action. The Court not only hopes, but *expects*, that whenever he is released, the defendant will remain a law-abiding citizen who mentors others to avoid the path he took earlier in his life.

The Court finds that the defendant has met his burden of showing extraordinary and compelling reasons that warrant a reduction in his sentence. The Court also finds that the sentencing factors under 18 U.S.C. § 3553(a) weigh in favor

of granting the defendant's motions. Accordingly, the defendant's motions for compassionate release (ECF Nos. 244 and 339) are **GRANTED**.

The defendant's sentence is **REDUCED** to 480 months of incarceration. This term of imprisonment consists of 480 months on all three counts, to run concurrently with one another. All other aspects of the defendant's sentence remain in effect.

As a result of this reduction of the defendant's sentence, the defendant's motions pursuant to § 404 of the First Step Act of 2018 (ECF Nos. 236, 239, 293, and 348) are **DENIED AS MOOT**.[16]

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to the defendant, to all counsel of record, and to the Federal Bureau of Prisons.

**IT IS SO ORDERED.**

/s/ JKW

Jamar K. Walker
United States District Judge

Norfolk, Virginia
September 11, 2025

[16] If the Court determined the defendant was entitled to relief under the First Step Act, it would have provided the same relief it grants here.